IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KELLY FREDERICKSON,

    Petitioner,               No. CIV S-08-1869 GEB GGH P

    vs.

ANTHONY HEDGEPETH,

    Respondent.           FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

    Petitioner is a state prisoner represented by counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2005 conviction for first degree murder. This action is proceeding on the original petition filed August 12, 2008, raising the following claims: 1) the trial court improperly precluded defense expert Dr. Pittel from testifying regarding petitioner's mental state at the time of the offense; 2) the trial court improperly precluded Dr. Pittel from testifying that petitioner's co-defendant[1] corroborated petitioner's statement that he had used methamphetamine; 3) the prosecutor committed

---

[1] While petitioner refers to this person, Emmanuel Lapuste, as a "co-defendant," Lapuste was not on trial with petitioner nor is there any indication in the record that he was ever convicted of a crime related to this incident.

misconduct by misstating the law of manslaughter; and 4) the trial court improperly denied petitioner's motion for a new trial which could have presented new evidence regarding petitioner's mental state.[2]  Petition at 5-6.

After carefully considering the record, the court recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the

---

[2] Two other claims were stricken pursuant to court order on August 14, 2009 (Doc. 23).

2

deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in

3

adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Background

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

> The victim, Ron Bailey, and a friend, Ed Gomez, went to [petitioner's] apartment to buy some drugs from another individual, Emanuel Lapuste. Shasta Flotka, who was living with [petitioner] at the time, recognized Bailey and later told [petitioner] that Bailey had drugged and raped her sister.
>
> Later, Lapuste called Gomez and asked Gomez to give him and [petitioner] a ride. Gomez and Bailey then picked up Lapuste and [petitioner], and Gomez followed Lapuste's instructions and drove to a wooded area outside Oroville. They pulled off the road onto a dirt driveway, then got out of the car and began walking up the driveway at Lapuste's direction. Eventually, [petitioner] told them they had gone far enough, and they stopped to smoke. As Gomez was lighting Bailey's cigarette, [petitioner] suddenly attacked Bailey with a knife.
>
> [Petitioner] stabbed Bailey at least 27 times, and Bailey died from blood loss from multiple penetrating stab wounds to his chest and head.
>
> [Petitioner] testified at trial that he was "overwhelmed with anger" because of what Shasta told him and because he believed Bailey had "touched" his daughter when Bailey was in his apartment. [Petitioner] claimed he planned only to "assault [Bailey] with a deadly weapon, cut off his penis or stab him in the penis," but did not think about killing him. Once he punched Bailey, however, he "just snapped" and began to stab Bailey. Later, [petitioner] and Lapuste went back and moved Bailey's body into the brush, and later still [petitioner] returned, dragged the body back into the road, and "attempted to cremate it with gasoline and matches."
>
> [Petitioner] argued the jury should convict him of voluntary manslaughter, but the jury rejected that argument and convicted him of first degree murder with the special circumstance of lying in wait.

Lod. Doc. No. 2; People v. Fredricksen, 2007 WL 665642 *1.

\\\\\

\\\\\

4

IV. Argument & Analysis

### Claim 1 - Expert Testimony: Mental State

Petitioner alleges violations of the Fifth, Sixth and Fourteenth Amendments due to the trial court precluding defense expert Dr. Pittel from testifying regarding petitioner's mental state at the time of the offense. Petition at 5.

*Legal Standard*

The right to present relevant evidence may, in appropriate circumstances, bow to accommodate other legitimate interests in the criminal trial process. See United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998) (defendant's right to present evidence in his defense "not unlimited" but rather is subject to reasonable evidentiary and procedural restrictions); Michigan v. Lucas, 500 U.S. 145, 149, 111 S.Ct. 1743 (1991) (right to present relevant testimony may bow to accommodate other legitimate interests) (citations, quotations, and internal quotations omitted).

Even if a trial court's decision amounts to constitutional error, a habeas petitioner is not entitled to habeas relief unless such error had a "substantial and injurious effect" upon the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct 1239 (1946)). See also Fry v. Pliler, 551 U.S. 112, 117, 127 S.Ct. 2321 (2007) ("[t]he opinion in Brecht clearly assumed that the Kotteakos standard would apply in virtually all § 2254 cases").

Discussion

Prior to trial, the prosecution moved to preclude Dr. Pittel from testifying to any conclusions or opinions regarding petitioner's state of mind either leading up to or when petitioner committed the murder. This motion was made pursuant to California Penal Code § 29 that states:

> In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are

5

not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

The trial court held that Dr. Pittel, "could not give an opinion as to whether at the time of the incident [petitioner] was or was not acting with a specific mental state . . . [b]ut he could testify to a diagnosis and what the ramifications of that diagnosis are." Reporter's Transcript (RT) at 71-72. The court further stated that Dr. Pittel "could testify to a hypothetical person, and then it would be up to the jury to decide whether [petitioner] was acting consistently in the same manner as that hypothetical person." Id. at 72.

The Court of Appeal summarized Dr. Pittel's trial testimony, as follows:

> During the defense case, Dr. Pittel testified generally about the "manifestations" and "consequences" of child molestation, including testimony that "underlying issues of anger and rage" are "[a]lmost always" "associated with early molestation." Dr. Pittel testified that "many things" can "trigger this anger or rage," and then turned to [petitioner] specifically. In the midst of that testimony, the prosecutor objected that Dr. Pittel was "going to [petitioner's] state of mind, which he's not allowed to do." When the court asked [petitioner's] counsel to rephrase or ask another question, counsel requested a bench conference. At that conference, [petitioner's] counsel asserted he "did not anticipate Dr.... Pittel talking about the state of mind at the time of the incident." The court cautioned counsel that Dr. Pittel could "speak in general terms about feelings of anger and rage in general, created by [petitioner's] early childhood experiences, but the triggers for it, that's another matter." [Petitioner's] counsel asserted that he could "ask [Dr. Pittel] whether certain events could have triggered-" but the trial court interrupted with, "Not that it actually did in his life." [Petitioner's] counsel said, "Okay," and Dr. Pittel's testimony resumed.
>
> [Petitioner's] counsel then asked Dr. Pittel about the "situations" that could have triggered "rage [in petitioner] that was stored in him from earlier molestation." Dr. Pittel testified without objection that "confrontation with ... someone who he knew as a molester, particularly if he knew that person had molested someone [who] he felt close to, or that he had some feelings of protectiveness toward" "could have provoked this anger or rage." He then testified that "confrontation with the person who had molested him would have provoked that." However, when he testified that he had asked [petitioner] "how he would feel if he confronted that person today," the trial court sustained an unspecified objection from the prosecutor, and the prosecutor admonished Dr. Pittel that he could not "talk about [petitioner's] state of mind." Dr. Pittel responded that he "wasn't talking about the [petitioner's] state of mind," but only saying that a confrontation between [petitioner] and his molester "probably would have evoked a very strong emotional reaction." The prosecutor objected to the word "probably," and the trial court sustained the objection, explaining, "We are dealing with the world of 'might' or 'could' here." Dr. Pittel responded, "My answer was intended to be a

6

hypothetical," and the court instructed [petitioner's] counsel to proceed.

Dr. Pittel then testified about [petitioner's] "strong need to be loved," or "affect hunger," and how it "could have contributed to his state of mind on the date of the incident" "in the strongly protective attitude that he held toward Shasta." He also testified about [petitioner's] relationship with his daughter and his methamphetamine use. He then testified about "kindling," a term he had used to "try[ ] to find a way to describe how the sequence of events in this case might have affected [petitioner]." When he testified "there was a fuse that was ignited by a number of different things that occurred," the prosecutor objected on the ground he was "obviously implying the [petitioner]." The trial court sustained the objection. [Petitioner's] counsel asked, "Could have?" and Dr. Pittel said, "Yes. I am not saying this did happen. I was trying to find a metaphor to explain how the sequence of events might have or could have affected [petitioner] on this occasion." He then testified that "the fact of the molestation and the consequences of that, both at the time and thereafter, coupled with the perceived danger to his daughter, the revelations from Shasta about Mr. Bailey's history of molestation of her sister, that this could have ignited a fuse that was already ready to go, and that had been dormant for a long time."

[Petitioner's] counsel then asked Dr. Pittel about the concept of "overkill." When Dr. Pittel testified that "wounds to the face" usually indicate "there is personal animosity between the perpetrator and the victim," while "[w]ounds to the body represent a more generalized rage toward a class of individuals," the prosecutor objected, asking, "Is he speaking hypothetically, or just referring to this case, I believe?" Dr. Pittel said he "was speaking hypothetically only," and the court instructed him to "[s]peak generally," which he did.

People v. Fredricksen, 2007 WL 665462 *2-4.

On appeal petitioner argued that the trial court misapplied California Penal Code § 29 and as a result Dr. Pittel's testimony only consisted of vague generalizations about hypothetical people in the abstract that severely intruded on his federal constitutional right to present a defense. In a reasoned opinion the Court of Appeal denied this claim:

We disagree with [petitioner] that the trial court restricted Dr. Pittel's "testimony to vague generalizations about hypothetical people in the abstract." Dr. Pittel was not prohibited from discussing [petitioner] in particular. For example, as we have noted, Dr. Pittel was specifically allowed to testify about the various factors particular to [petitioner] that "could have ignited a fuse" at the time of the killing. Dr. Pittel later confirmed that he believed he had covered all of the "conditions that exist that could have affected [petitioner]'s state of mind at the time of the killing."

The nature of the trial court's rulings was to preclude Dr. Pittel from testifying as to what actually did happen or probably happened in [petitioner's] mind on the day of the incident-as opposed to what could have happened. Thus, when defense counsel insisted that he could "ask [Dr. Pittel] whether certain events could have

7

triggered" anger or rage in [petitioner], the trial court did not disagree; the court merely insisted that Dr. Pittel could not testify that certain events "actually did" trigger anger or rage "in his life." Similarly, when Dr. Pittel testified "there was a fuse that was ignited by a number of different things that occurred," the trial court's sustaining of the prosecution's objection led defense counsel to ask whether there was a fuse that "[c]ould have" ignited what occurred, and Dr. Pittel's testimony about what "might have or could have affected [petitioner] on this occasion" was admitted without objection. And when Dr. Pittel testified that a confrontation between [petitioner] and his molester "probably would have evoked a very strong emotional reaction," the court sustained the prosecutor's objection to the word "probably" and told Dr. Pittel, "We are dealing with the world of 'might' or 'could' here."

As to this aspect of the court's ruling, [petitioner] complains that "[w]hat the jury heard was that it may have been a possibility; what they should have heard was Dr. Pittel's opinion that it very likely did affect [petitioner's] ability to premeditate and deliberate." Even if we assume for the sake of argument, however, that [petitioner] is correct in asserting Dr. Pittel should not have been precluded from testifying to the likelihood of how certain factors influenced [petitioner's] mental processes, rather than the mere possibility of such influence, with only one exception, there is no showing in the record that Dr. Pittel would have testified in terms of likelihood had he been allowed to do so. (See Evid.Code, § 354, subd. (a) [judgment cannot be reversed based on erroneous exclusion of evidence unless "[t]he substance ... of the excluded evidence was made known to the court"].) If defense counsel believed his witness's anticipated testimony was being unduly restricted by the court's ruling that Dr. Pittel could testify only to what "could have" affected defendant's mental processes, he was obliged to make a record of what Dr. Pittel's testimony would have been absent the restriction, but he did not do so. Accordingly, on the record now before us, we have no way of knowing whether Dr. Pittel would have testified with greater certainty had he been allowed to do so.

The one instance where the record is adequate is when Dr. Pittel testified that a confrontation between [petitioner] and his molester "probably would have evoked a very strong emotional reaction," and the trial court sustained the prosecutor's objection to the word "probably," telling Dr. Pittel, "We are dealing with the world of 'might' or 'could' here." This incident is of little significance, however. Because this case did not involve a confrontation between [petitioner] and his molester, it does not matter whether such a confrontation "probably would have" or only "could have" evoked a strong emotional reaction in [petitioner]. The trial court's limitation of this immaterial evidence did not prejudice [petitioner's].

Having concluded [petitioner's] has failed to show any reversible evidentiary error in the trial court's ruling on the scope of Dr. Pittel's testimony under Penal Code section 29, we likewise conclude [petitioner's] has failed to show any error of federal constitutional magnitude.

People v. Fredricksen, 2007 WL 665462 *3-5.

\\\\\

1  Petitioner now argues that restricting Dr. Pittel's testimony was a violation of the
2  federal constitution. Petition at 5. However, petitioner cites to no case law and other than
3  concluding there was a constitutional violations, makes no substantive argument. Petitioner has
4  failed to demonstrate that the Court of Appeal's opinion was contrary to or in violation of
5  established federal authority.
6  The California Supreme Court has declared Cal. Penal Code § 29 constitutional.
7  People v. Coddington, 23 Cal. 4th 529, 583, 97 Cal. Rptr. 2nd 528, 579 (2000). No United
8  States Supreme Court case has held § 29 or any other statutory equivalent unconstitutional.
9  Indeed, the federal counterpart to § 29, Fed. R. Ev. 704(b), remains intact and unscathed. See
10 United States v. Abou-Kassem, 78 F.3d 161, 166 (5th Cir. 1996); United States v. Austin, 981
11 F.2d 1163 (10th Cir. 1992). Thus, if the rule precluding an expert from directly opining on the
12 mental state of a defendant is acceptable in federal law, it is acceptable for the states as well. The
13 undersigned will not interpret the rule permitting the bending of evidentiary rules when critical to
14 the theory of the defense to apply to simply wipe out evidentiary restrictions in the ordinary case.

15  Claim 2 - Expert Testimony: Corroboration

16  Petitioner next argues that his federal constitutional rights were violated when the
17 trial court precluded Dr. Pittell from referring to a statement from another party that corroborated
18 that petitioner had been using methamphetamine on the night of the murder. Petition at 5.

19  Discussion

20  The Court of Appeal discussed the relevant background of this claim.

21  During cross-examination, Dr. Pittel testified that he had been able to corroborate
    "all of the ... essential details to which [he] testified" "except for information
22  having to do with [petitioner]'s use of methamphetamine in the days prior to [the
    incident], and the depression that he experienced after breaking up with a
23  girlfriend." When the prosecutor asked specifically about his inability to
    corroborate [petitioner's] methamphetamine use, Dr. Pittel responded: "Other
24  than his statement to that effect, I have no evidence. I have not read the transcript
    of an interview that [defense counsel] and his investigator had with Mr. Lapuste,
25  who I believe corroborate...." The prosecutor interrupted, asking for a bench
    conference. At that conference, the court stated, "Can't have any references to Mr.
26  Lapuste here." The prosecutor complained he had not been provided with any

9

> witness statement of Lapuste, and when asked if there were any, defense counsel responded, "We usually had to provide statements when we call somebody as a witness." Noting that Lapuste was "not a witness," the court ruled "[a]ny information he supplied should not be considered." Defense counsel suggested Dr. Pittel should be able to refer to Lapuste in responding to the prosecutor's question about corroboration, but upon the prosecutor's continued assertion that he had not been provided with any statement from Lapuste, the court ruled, "I think we should stay clear of any information regarding Lapuste." Defense counsel responded, "All right."
>
> Later, the subject of corroboration arose again when, in responding to a question about whether "a criminal defendant in a case has a motive, a self [-]interest in whatever he says to you," Dr. Pittel responded, "Sure. That's why corroboration is so important." The prosecutor then asked if Dr. Pittel, in his report, had "corroborated what [petitioner told him] about what happened to Ron Bailey." Dr. Pittel initially expressed uncertainty about "what aspects of it [the prosecutor was] referring to," but then responded, "[Petitioner] acknowledged that he stabbed Mr. Bailey. He described the circumstances. I gather from the bench conference that was held that I can't speak to certain information that I have, but...." The prosecutor interrupted, telling Dr. Pittel he could not "refer to anything Mr. Lapuste has said." Dr. Pittel responded, "I won't refer to it specifically, other than to say that my understanding is that his account was in accord with the information that I received from [petitioner]." The prosecutor asked, "Mr. Lapuste's account of what happened to Mr. Bailey?" and defense counsel interjected, "Hold on, judge. We either can or can't." The court then admonished the jury "to disregard any information that came from the mouth of Mr. Lapuste."

People v. Fredricksen, 2007 WL 665462 *5; RT at 483, 502, 504-05.

Essentially, the trial court precluded Dr. Pittel from referring to statement in his testimony that Dr. Pittel acknowledged he had not read or reviewed. Nor had this statement been provided to the prosecution. Petitioner argues that this violated the Fifth, Sixth and Fourteenth Amendments. Petitioner cites to no case law and provides no argument in support.

On direct appeal, the Court of Appeal properly denied this claim stating:

> On appeal, [petitioner] contends the trial court "erred in refusing to permit Dr. Pittel to refer to the statement of Emanuel Lapuste that corroborated the statement he had received from [petitioner]." [Petitioner] further contends this error deprived him of his federal constitutional rights to due process, a fair trial, and to present evidence. [Petitioner] is wrong on both counts.
>
> [Petitioner's] assertion of error is based on the premise that an expert witness is allowed to testify about the matter on which his opinion is based, even if that matter would otherwise be inadmissible. (See Evid.Code, §§ 801, 802.) While that principle is generally true, it does not apply to any statement by Lapuste because Dr. Pittel did not base his opinion on any such statement. Indeed, Dr.

10

> Pittel specifically admitted that he "ha[d] not read the transcript of [the] interview that [defense counsel] and his investigator had with Mr. Lapuste...." Dr. Pittel's opinion could not have been premised on a statement he never read. Thus, [petitioner] has failed to show any error in the trial court's ruling regarding Lapuste. It follows that, having failed to show any error, [petitioner] has necessarily failed to show any error of federal constitutional magnitude.

People v. Fredricksen, 2007 WL 665462 *3-5.

The state court's opinion is clearly not contrary to established Supreme Court precedent. A defendant's right to present evidence is subject to reasonable evidentiary restrictions. See Scheffer, 523 U.S. at 308. It was quite reasonable for the trial court to preclude the expert from testifying about a statement the expert never read. Petitioner's claim is meritless and should be denied.

### Claim 3 - Prosecutorial Misconduct

Petitioner contends that the prosecutor misstated the law of manslaughter which resulted in violation of the Fifth, Sixth and Fourteenth Amendments. Petition at 6. Respondent argues in accordance with the Court of Appeal opinion that this claim was forfeited because defense counsel never objected at trial. Answer at 11.

### Legal Standard

Under the doctrine of procedural default, a petitioner who has defaulted on his claims in state court is barred from raising them in federal court so long as the default is "pursuant to an independent and adequate state procedural rule." Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991). In Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit adopted a burden-shifting analysis to determine adequacy. Under this analysis, the state may plead, as an affirmative defense, that the petitioner's failure to satisfy a state procedural bar should foreclose federal review. Id. at 586. Once the state pleads the bar, the burden shifts to the petitioner to challenge the adequacy of that bar by showing that it has been inconsistently applied. Id. The state has the ultimate burden of proving adequacy. Id.

\\\\\

1   It is established under California law that a defendant must make a timely
2   objection at trial and request an admonition of the jury to preserve for appeal a claim of
3   prosecutorial misconduct.  People v. Najera, 138 Cal. App. 4th 212, 224 (2006).  In Vansickel v.
4   White, 166 F.3d 953, 957-58 (9th Cir. 1999), the Ninth Circuit held that California's
5   contemporaneous objection rule was sufficiently independent and adequate to find a federal
6   claim procedurally defaulted.  See also Rich v. Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999)
7   (Ninth Circuit held that where the state court expressly invoked the contemporaneous objection
8   rule as the basis for rejection of the claim may it was properly applied as a state procedural bar on
9   federal review.)

10                  Discussion
11  In the instant case, the Court of Appeal found that petitioner had failed to
12  demonstrate any good reason for trial counsel's failure to object to the prosecution's statements,
13  thus the state court refused to look to the merits of petitioner's claim finding it forfeited.  People
14  v. Fredricksen, 2007 WL 665462 *6.
15  Respondent raised the issue of procedural default in their answer, however,
16  petitioner did not file a traverse and has not proffered any arguments regarding the adequacy of
17  this state procedural rule, failing to meet his burden under Bennett.  Nor has petitioner attempted
18  to demonstrate cause for the default and any prejudice.  Coleman, 501 U.S. at 750.  This claim is
19  procedurally barred and should be dismissed.
20                  Claim 4 - Motion for New Trial
21  Finally, petitioner argues that the trial court improperly denied his motion for a
22  new trial even though new evidence could have been presented regarding petitioner's mental
23  state.
24                  Legal Standard
25  Habeas corpus is unavailable for alleged error in the interpretation or application
26  of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1981); Givens v.

Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Estelle v. McGuire, 502 U.S. at 68. In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness." Id. at 73. The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. Id. at 73.

Discussion

This claim was presented to and denied by the Court of Appeal.

> [Petitioner] moved for a new trial in part on the ground that "[n]ewly discovered evidence developed through psychological testing for purposes of a sentencing memorandum demonstrates that defendant has a mental disability and dysfunction that would have rendered it highly likely that he remained in a heat of passion between the time of his confrontation with the decedent at his home and the time of the homicide[ ]." [Petitioner] contended he "could not with reasonable diligence have presented this evidence at trial, because neither counsel nor Dr. Pittel were aware of any particular aspect of [petitioner]'s past behavior or current mental state presentation that suggested a need for psychological testing with respect to the guilt phase defense." [Petitioner] admitted, however, that he "could have insisted that Dr. Pittel administer psychological tests in anticipation of the guilt phase."
>
> The trial court denied the new trial motion on this ground, ruling that the results of the psychological testing were "evidence that with reasonable diligence could have been prepared and presented at the time of trial" and that, in any event, the evidence did "not indicate that a different result in the case [wa]s probable."
>
> On appeal, [petitioner] contends the trial court erred in denying his new trial motion based on the newly discovered psychological testing results. We disagree.
>
> "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (People v. Delgado (1993) 5 Cal.4th 312, 328.) One of the factors a trial court must consider in ruling on a motion for new trial based on newly discovered evidence is whether "the party could not with reasonable diligence have discovered and produced [that evidence] at the trial." ( Ibid.)
>
> [Petitioner] contends he could not, with reasonable diligence, have discovered and produced the psychological testing results at trial because neither his trial counsel nor Dr. Pittel was aware of anything that "suggested a need for psychological testing with respect to the guilt phase defense." He further contends that if reasonable diligence required such testing in this case, then there would be "a mandatory obligation on trial counsel to conduct psychological testing on their

13

> clients for the guilt trial in every case."
>
> We are not persuaded. The newly discovered evidence on which the new trial motion was based were the results of two common psychological tests-the Rorschach inkblot test and the California psychological inventory-that revealed [petitioner] "has a particular psychological problem ... basically called a 'coping deficit index,'" which "refers to the ability of a person, to cope, to make decisions in the face of stress." According to Dr. Pittel, this problem made [petitioner] "particularly vulnerable" to the "stressors" that led him to kill Bailey and essentially made it impossible for him to "cool off." Obviously such test results were relevant to [petitioner's] contention that he was guilty only of voluntary manslaughter because he acted in the heat of passion. Given this fact, [petitioner's] explanation for why the psychological tests were not conducted before trial falls short of showing that the test results could not have been obtained in the exercise of reasonable diligence.
>
> Dr. Pittel testified "[t]here was no reason to" conduct these tests before trial because he believed his "understanding of [petitioner]'s developmental history, coupled with the events of that evening, more than sufficiently explained why he behaved as he did that evening" and because "there was nothing about his behavior or about his acts that evening that led [Dr. Pittel] to suspect that he was suffering from any diagnosable mental illness that contributed to the crime." Dr. Pittel did not explain, however, why he did not consider the use of psychological tests to determine whether [petitioner] suffered from a psychological "problem" amounting to something less than a "diagnosable mental illness" that might be relevant to [petitioner's] claim he acted in the heat of passion. [Petitioner] did not offer any evidence suggesting it is standard practice not to conduct psychological tests in preparing for a manslaughter defense in a murder case, or any evidence suggesting that the particular test results in this case were so unexpected that the possibility of their occurrence could not have been reasonably anticipated.
>
> In short, on the facts of this case, there was no manifest and unmistakable abuse of discretion in the trial court's determination that the psychological testing results could, with reasonable diligence, have been discovered and produced at the trial. Accordingly, the trial court did not err in denying [petitioner] new trial motion.

People v. Fredricksen, 2007 WL 665462 *7-8.

Preliminarily, the undersigned echoes the concerns of respondent and is not entirely certain how to approach this claim. While petitioner alleges violations of several constitutional amendments, the claim ultimately seeks federal habeas relief concerning the application of state law and the alleged error of the trial court and the state appellate court. If this is in fact petitioner's claim, then it is foreclosed pursuant to Estelle. That is, petitioner argues that the state courts did not correctly apply their due diligence standard. This argument does not state a cognizable claim in habeas corpus.

14


To the extent petitioner could be alleging a violation of due process in not being allowed to present a defense, respondent correctly notes that petitioner cannot transform a state law issue into a federal claim by claiming "due process" error. Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997). To the extent petitioner could allege any other federal claim, no other claims were exhausted.

Even if the undersigned could review the diligence ruling, nothing would change. As the Court of Appeal emphasized, petitioner has offered no evidence why the two common psychological tests were not utilized for the trial. During the trial Dr. Pittel testified that he did not conduct formal testing of petitioner because, "[typically] if in the course of doing any interviews I believe there is a reason to suspect that the person might have significant mental problems or psychiatric problems, then I would have either do a more formal clinical diagnostic interview, or administer psychological testing. In this case I didn't feel that was the case." RT at 470. It is still not clear what led Dr. Pittel to change his mind.

Finally, even to the extent that the undersigned would review the merits of the new evidence put forth at the motion for new trial, the result would not change. When constitutional error is alleged in habeas for failure to re-open a trial upon new evidence presented, courts sitting in habeas jurisdiction employ a "probability of acquittal" standard. Quigg v. Crist, 616 F.2d 1107, 1112 (9th Cir. 1980). The evidence that petitioner had a "coping problem," while relevant, is hardly persuasive given the time period from the commencement of the stressors to the killing of the victim. While the "coping problem" may have extended the time in which petitioner could have been under heat of passion, there has to be limits such that petitioner does not constantly wander about in a "heat of passion." The jury would have seen the theory as the stretch that it was. Moreover, as described in detail above, California Penal Code § 29 does not allow an expert to testify to a defendant's state of mind. Whatever psychological test or theory could have been presented, could not have been used to describe plaintiff's state of mind.

1   For all these reasons, this claim should be denied.

2   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for
3   a writ of habeas corpus be denied.

4   If petitioner files objections, he shall also address if a certificate of appealability
5   should issue and, if so, as to which issues. A certificate of appealability may issue under 28
6   U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a
7   constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate
8   which specific issue or issues satisfy" the requirement. 28 U.S.C. § 2253(c)(3).

9   These findings and recommendations are submitted to the United States District
10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen
11  days after being served with these findings and recommendations, any party may file written
12  objections with the court and serve a copy on all parties. Such a document should be captioned
13  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
14  shall be served and filed within fourteen days after service of the objections. The parties are
15  advised that failure to file objections within the specified time may waive the right to appeal the
16  District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  Dated: 07/29/10

18                                                          /s/ Gregory G. Hollows
                                                            _____
19                                                          UNITED STATES MAGISTRATE JUDGE

20  ggh:ab
    fred1869.hc